Good morning. Obviously, my name is Pamela Price and I'm very pleased to be here today on behalf of plaintiff Martha Berndt. Your Honors, the issues that I'd like to address before you today are two of our appellate issues. One is whether or not the district court erred in denying the motion for new trial and whether the verdict was in fact against the clear weight of the evidence. Obviously, I'm prepared to address any other questions you may have. Well, let me ask, is the new trial motion solely on the weight of the evidence? Yes, Your Honor. Okay. So that's really just one issue, right? Well, yes. I mean, we also argued that the admissibility of the evidence, we did challenge the admission of the testimony of the statement. Okay. So but if the testimony that you challenged is admitted, was there – should the new trial motion have been granted nonetheless or are they dependent on each other? I would argue that they are related, but I do think that the new trial motion should have been granted nonetheless. Because it's our view that although the admission of the testimony was erroneous, that testimony did not, should not have gone to the ultimate issue of weight. Rule 704 says that an expert may opine as to an ultimate issue. Yes, Your Honor. In this case, the expert lays out why he – there's been this many incidents and there's this many prisoners and there's this many years and the jury hears all those facts, which you don't object to. And then at the end, you object to his characterization that the bad conduct is not pervasive. What difference does it make at that point after the jury has heard all the supporting facts that go to it? Well, the concern is that by the use of the language in the question and then his characterization of the way in which he answered the question is that it suggests to the jury that the finding that they have to make is that he can opine to an ultimate issue. Rule 704 says that. And he's laid out the reasons why he thinks it's not pervasive. Your expert then lays out the reasons why it is pervasive. But all those facts were properly admitted to the jury. So I'm having difficulty seeing why there was any prejudice from him then characterizing that aggregation of facts as showing that this conduct was not pervasive. The problem is that the terms that he's using, which are then in the jury instruction and what the jury then has to make the ultimate finding on, suggests to them that because he says it's not severe or pervasive, that therefore that's in fact the finding that they should make. Can't your expert use the exact same phrase? He may have well used the term pervasive. Our expert, we don't believe, testified to it in the same manner to suggest to the jury that this is the way you should find it. So that's, we believe, the distinction. So we view the judge's ruling on your objection to the word pervasive for abuse of discretion? Yes, Your Honor. Yes, Your Honor. Can you also address whether Mr. Skerek is involved in this? I didn't see that he was mentioned in your motion for a new trial. So have you waived those claims against Skerek? Or how is Skerek involved in this appeal? Skerek is involved in appeal. He certainly is briefed in the opening brief. I don't believe we would. I'm not suggesting you waived. The question is, did you waivered against the weight of the evidence argument as to Skerek, since you never made it below? So he wasn't in your motion for a new trial. You didn't make any argument about Skerek in the motion for a new trial with respect to Skerek. I'm just trying to understand whether there's a new trial argument against him here on appeal. If it's not in the motion, Your Honor, then I would submit that it would not be there. So what's your argument on appeal about Skerek? It's that — I mean, you know, I understand your argument, because he's not part of — pervasiveness is not an argument as to him. He's being — the argument as to him is he's engaged in specific acts. Yes, Your Honor. So what's your argument on appeal about why the judgment in favor of Skerek should be reversed? It would — our argument on appeal is that Skerek participated in a set — in motion, a series of steps. Right. And you made that argument to the jury and — Yes, Your Honor. — they didn't buy it. Yes, Your Honor. Maybe they should have. But are you arguing that — so — and you didn't argue to the judge that their verdict was against the weight of the evidence as to Skerek. So why — if you want us to reverse as to Skerek, tell me why. Yes, Your Honor. Well, certainly, it — if it is — to the extent that the Court is correct that it's not in the motion for new trial, I would have to concede and submit that we have not preserved the issue as to Skerek. And do you have any other issues as to — that are — that would require reversal as to Skerek? I mean, you have some evidentiary arguments. Do they go to your case against him or only your case against the CDRC? It goes to our case against him, Your Honor, but I concede that if it's — Well, that's why — I'm looking at them. I'm not sure why exclusion of the other officers' disciplined forms has anything to do with Skerek. Yes, Your Honor. Or evidence before a certain date, or judicial notice, or Dr. Martin's testimony. So I'm having difficulty seeing any arguments in your brief that really pertain to Skerek. That is correct, Your Honor. Skerek's involvement was basically she asked that she — that he not be placed in a cell nearby, and Skerek put some other guard to be in the area, and that maybe predictably, maybe not that other guard was called away to other responsibilities. But what else did — what else did he have involvement with her? Skerek was her supervisor for a period of time prior to the incident — the final incident culminating in her disability. But regard to that incident, his — your only complaint against him was that he placed a guard between the two of them, but didn't do anything more? No, Your Honor. Our complaint against Skerek is that on the day in question, that he essentially ignored her request, and he ignored the situation because he was aware prior to that day that Jackson had this behavior, that he typically engaged in the behavior, that he had directed that behavior toward Officer Burnt previously, and that she was asking that he not — she not be exposed, essentially, to that misconduct, and that he disregarded all of both her requests as well as the information that he knew and put her in a position where she could be victimized. But I still don't understand what your argument on appeal has to do with this, that you made that argument to the jury, they heard it, and they came out the other way. But why should we reverse this on appeal? Well, I'm prepared to submit that, Your Honor, on the question of Skerek, because I am concerned that we not — Let's move to CDCR, then, if you're submitting on Skerek. Yes. So why was the ruling against the clear weight of the evidence? So why was the jury's verdict against the clear weight of the evidence? Because there is no evidence that Officer Burnt was not subjected to severe as well as pervasive conduct. Exhibitionist masturbation is a fundamental change in the terms and conditions of employment for a female officer. So how many years was she there? She was there approximately seven years. And how many — I think it's 115 forms did she submit over that seven years? We believe there were at least four that were admitted at trial. We don't have a total number because 115 forms weren't maintained. Was there any record evidence of either assaults or other things she submitted 115s on? No, Your Honor. Okay. So their expert testified, I believe there were somewhere around 1,000 incidents over an 11-month period, and what, 75 or so of them involved sexual assault. This kind of exhibit, exhibitionist conduct? I believe so, Your Honor. That may be accurate. Yes, sir. So if the jury could have found the other way, acknowledging the jury potentially could have, should courts of appeals be reviewing jury verdicts or trial judges' findings on their judgment NOV? Well, I think the presumption that it is true in a jury trial, a jury could always find the other way, Your Honor. And so there are the standards that we're here under contemplate that there are occasions when courts of appeal, in fact, do review what the jury's findings are. In this case, was the big issue whether the working conditions were severe and pervasive No, the big issue, unfortunately, that's a misstatement of the issue. The issue is whether or not the conduct that she was subjected to was sufficiently severe or pervasive to alter the terms and conditions of her employment. And the issue before the jury is, do female officers, and in particular Officer Byrne, if she is subjected to exhibitionist masturbation, does that alter the conditions of her employment because she's a woman? In other words, is it sufficiently pervasive so it alters the terms of her employment? I think what Judge Gooden was asking, this is what I'm asking anyway, isn't it a question of fact whether it was sufficiently pervasive? It's a question of fact whether it's sufficiently severe or pervasive, yes. And so the jury hears your arguments and they hear the state's arguments. I run the jury, I might well rule for you, but what's our job here? It's not a question of arguments, Your Honor. It's a question of facts. Right. The question of evidence. There was no evidence that this problem, as directed towards Officer Byrne as well as the other officers, was not severe, was not serious, or that it was not pervasive. So there's evidence in the jury? That judgment should have been issued in your favor? I think that judgment should have been issued in our favor, but yes, because there's no evidence. The question before you, is there some evidence to support the verdict? That's right. There was Martin's testimony. There was the limited numbers of, he testified that this was, the working conditions included working with the worst of the worst, that there was no way to prevent this sort of behavior, that Martin said it wasn't serious in comparison to the number of assaults. So the, and there was also evidence that the CDCR promptly addressed the situation. So there was evidence that the jury could have credited, if not for severe and pervasive, but not to alter the conditions of employment. So I didn't see a complete absence of evidence. Are you arguing there was, well, you are arguing that there's no evidence, so how do we deal with the fact that there was some evidence in the record? The evidence in the record that the Court below relied upon and that this Court is citing is that the conditions of, that the prison conditions in general are so extreme that therefore a little masturbation or a few incidents of masturbation does not. Yeah, exactly. So unless there was a per se rule. So you agreed with Judge Hurwitz that there's not a per se rule that if there is one incident that's severe or pervasive, you automatically have a, have prevailed on your Title VII claim. So if you, if you have agreed with that, then it's just a question of the facts, whether they, and that's the province of the jury. Right. And when one looks at what the rule, it's also a question of law. And the law says the fact that an environment, a work environment is of this nature does not therefore give the Department of Corrections a pass. We established that rule in Freetag. The fact that this is a prison, a male prison, the same prison that Officer Freetag worked in, does not therefore mean that the women who work at the prison are, have to be required to undergo a gauntlet of sexual abuse. And that's why this gets to trial, right? Because we don't have a rule going the other way either. It isn't as a matter of law, a prison in this situation, this sort of exhibitionist behavior and assaults is expected. So you don't have a Title VII claim. There's no genuine issue of material fact. I mean, you get to trial and then the jury found the other way. Right. But the evidence is not that the conduct directed toward her was not severe or that the conduct was not pervasive. It is the only evidence, again, coming through Mr. Martin's characterization is that this is a terrible place for anyone to work. The question, the law doesn't prohibit that. What the law prohibits is differential treatment of women based on their gender. And it does prohibit a gauntlet of sexual abuse. It's the big issue here, though, whether it was sufficiently pervasive or that it becomes as a matter of law. You've got a right to judgment. I think the issue is, where do you draw the line? I mean, if the inmates were raping the women, would the jury be entitled to say that it's perfectly okay because this is a terrible place and there's a risk that you might be subjected to rape? The Department of Corrections argument was that they acknowledged that this was improper conduct. Yes. But I think their argument seemed to be that she worked there seven and a half or eight years. There's four incidents over eight years that I think their argument was that you haven't met a showing as a matter of law that that's necessarily pervasive. Well, in that case, they would have moved for summary judgment. But that's not the evidence. The evidence that she testified, which was undisputed, is that she wrote 128 reports. She put it in the logbooks. It was not simply four incidents. That was their argument. That was not the evidence that was presented at the time of trial. 128 reports. She had no way of knowing how many there were because they were. The only evidence in front of the jury were the 115s, right? No. There was the evidence. It was her testimony. As well as the testimony of Rick Newton, as well as the testimony of D.I. Freitag. But is a jury required to believe that testimony? It sounds to me like it's believable testimony, but that's why we have juries. They might discount that testimony. That's true. But the question before you is what is there some evidence to dispute that testimony. There is no evidence to dispute. Is it the burden of the other side to dispute the testimony, or is it your burden to convince the jury that you've established something? It is our burden to present the evidence, which we did. If the state had just rested at the end of your case and said, we don't think they've made their case, let's go to the jury. And they said, there's really only four reports. You really can't believe her on the other ones because there's no record of them. And the jury found for the state, would that be improper? No, that's not their burden to rebut. It's your burden to convince the jury. That's true. But the question is, when you look at the, and the trial court looks at the verdict, is there some evidence to support the reasoning of the jury that there are only four incidents? There's no evidence of that. The evidence is that the 128s were used throughout the prison. And during her time of employment, even 115s were not allowed until late 1998. That was the evidence before that. I may misrecall this, but I thought the record was that there was only about two or three 128s. That is not accurate, Your Honor. Certainly Rick Newton's testimony, as well as the evidence from, I believe, Officer Freetag, as well as Officer Burke, it was more than one or two. I would like to reserve some time for my rebuttal. Thank you. Good morning, Your Honors. Lynn Harling, Deputy Attorney General with the California Department of Justice for Defendants and Appellees, California Department of Corrections, and David Skerek. I'd also like to acknowledge the contribution of my co-counsel, Chris Young, to this appeal. So starting with what, what Your Honors were questioning Ms. Price about, there was, defendants put on highly relevant evidence to show no hostile work environment, as well as significant credibility issues with plaintiff's trial testimony. Plaintiff, we put in plaintiff's contemporaneous reports for the four indecent exposure incidents she reported, and particularly her July 18, 2002 memo detailing the events of July 12th and 13th, which we had her read into the record. And though both of, both of those report, all of those reports showed a significant marked, significant difference between what she testified to and . . . There doesn't seem to be any dispute in this case that, that inmates at this play, at Pelican Bay, engage in exhibitionist behavior of the type she complains of, right? Correct, Your Honor. There's no dispute . . . In fact, they said it could not be eliminated. Well, put that aside for a second. There's no dispute that she was subjected, at least to some of it. Yes. Okay. Mainly the, of the four incidents she reported, three by Goldwire Jackson, who was a notorious, unrepentant . . . So the answer to my question is yes. Yes. Okay. My question is this, there's no doubt that that's, that, that's behavior that makes the workplace quite uncomfortable. What's your, what's your argument about why that behavior doesn't change her conditions of employment? Is it because it's routine? Is it because it doesn't happen that often? What's, so it's, there's, we're not fighting in this case about the nature of the, of the conduct to which she was exposed in the workplace. We're fighting, the issue is whether or not that changed her conditions of employment. So tell me what your argument is about why it didn't. Well, plaintiffs spent more than half the trial putting on free tag evidence, evidence from the free tag case, which showed during the 1990s that it was an overwhelming problem that went unaddressed by the California Department of Corrections. In contrast, Berndt had in the, in the late 1990s and 2000s, had a totally different work experience than free tag. And so Berndt's experience was markedly different. So the jury had that context. Is your argument, I'm just trying to, your argument is that it didn't happen, it didn't happen that much to constitute what she had to prove? Or is it your argument that, that it wasn't so bad? Which, what is your argument? Given the background context that plaintiff put into evidence, Berndt's work experience was significantly less. She had significantly less to contend with. Well, but we're not, we're not measuring whether or not it was, we're not measuring whether or not her work experience was worse than FriTags or FreeTags. The question is whether she was subjected to a hostile work environment. So tell me why, since you can see these incidents occurred at least on some number of occasions, why the jury could find that she wasn't subjected to a hostile work environment. None of the incidents were severe or out of the ordinary. And it was in the context of working in the SHU at Pelican Bay and the jury rightfully found that Berndt's experience did, her, the harassment that she was subjected to was not pervasive or severe. So the answer is that even if it occurred, it wasn't so pervasive or severe as to change her conditions of employment. And she had, she had a much less to contend with than many of the, much of the evidence that came in as to other female officers. So in comparison, the jury can. Because the opposing counsel says there's no evidence that would allow a jury to find that the four noted incidents or that this conduct was not severe or pervasive to alter the conditions of employment and create an abusive working environment. So what evidence was put in by the government? So we put in the actual, her actual reports, which differed from her testimony at trial. So there was a credibility issue. There was a credibility issue. We put in the photos of what she actually saw, the bird's eye perspective of what Berndt saw, which, so the TV monitors, one of the incidents she reported was a, you know, on a TV monitor in the yard. So the jury got to see photos of just how little that TV monitor is and how far away it would be. They got to see photos of the holding cell that Jackson was put in on July 12th. Very thick perforated doors, how far away it was from the booth. And then we put in the testimony by several people of the overall working conditions, which contrasted the number of assaults and the dangerousness and the insults and the other things that the inmates did to, subjected all correctional officers to, along with the 3% of masturbation incidents. And also there was evidence that two inmates in particular contributed to more than half of the indecent exposure incidents. One was Goldwire Jackson, and she bid into that unit knowing he was there. So her specific work environment for incidents over a period of more than two years, given that environment, the jury felt was not actionable in terms of pervasiveness or severity. How many of the incidents involved yard behavior? So one of the incidents with, so the first incident that she reported was with a different Jackson, and that was in a holding cell, I believe. The second, so the three with Goldwire Jackson, one was when she was in a different assignment and he was brought into the unit to use the clippers in her unit's holding cell, but he was housed in a different cell. The second one was on the yard monitor. So when he was out on yard, and so it was on the TV. And then the third incident was when Sergeant Skerek put Goldwire Jackson, who was housed in the unit that she was working in, in the holding cell to use the clippers after he had been, he had been out on looking at his legal property. And so they, rather than rehouse him or do anything else, they put him in the holding cell to use the clippers. How approximate were they one to another in terms of dates? The first incident was, so the Charles Jackson incident was in 2001, and the three with Goldwire Jackson was December 2nd, 2001 in the holding cell in another unit. Uh, June 2nd, 2002 was the yard incident, and July 12th, 2002 was the holding cell incident in her, the unit she was working in. So at least two within a month of each other, and the others more than six months apart. Correct. And this is also in the context of significant evidence that plaintiff put in about Goldwire Jackson that showed years of, he actually had gotten better over time. The evidence came in that he had been doing this for years and there are numerous reports about Goldwire Jackson came in. So it was in the context of Goldwire Jackson's mis, misconduct. As to Steve Martin, Steve Martin was, uh, was allowed to give an opinion on the ultimate issue, but not as to Berndt. If you look at the record, um, excerpts, pages 40 to 41, the court sustained plaintiff's objection as to whether he could opine about severe pervasive   uh, the severe pervasive standard regarding plaintiff's specific circumstances. The court allowed Martin as rebuttal because plaintiff's prison expert had gone on and on and on about the pervasiveness of, of indecent exposure as background context. The court allowed Martin to give an opinion as to severe pervasive background context as to the overall situation at Pelican Bay. Would it be an error if he, the court had allowed him to give an opinion as to plaintiff's claim under 704? Um, it was for the jury to, to make that analysis. It's an ultimate, it's an ultimate fact. Right. You couldn't say he couldn't opine that the plaintiff loses my, my legal opinion, the plaintiff loses, but could he opine that in my opinion, these acts were not sufficiently pervasive to change the conditions of employment? Well, under 704A, he would be allowed to give, um, an opinion on that ultimate issue, but the court did not allow it and allowed the jury to make that analysis because it was a factual determination. Also, uh, Steve Martin testified that he didn't have any expertise in, uh, EEO issues and such, so he was a prison expert. Um, and so. So his testimony was basically, this doesn't have, this, this doesn't happen so regularly in the prison is to change things. Correct. Correct. It, uh, both experts and numerous witness testified that you cannot eliminate it from the workplace. It's so it, it, um, you know, you can, you can manage it as an employee by bidding different kinds of jobs and different. And so there, there are ways to manage it. And then the, the CDCR actually does address it, but it, it, on any given day and a correctional officer does not know what they're going to be facing that day. I don't need to discuss Mr. Skerek because it has been conceded that, uh, the, that they don't have an issue as to the new trial as to him. I want to just point out that the jury verdict that, uh, Sergeant Skerek did not discriminate against plaintiff was supported by the evidence the jury heard in detail, all the events of the July 12th and July 13th, including the reasons why Sergeant Skerek made his decisions as to placing Goldwater Jackson on July 12th, they also heard plaintiffs. They also heard plaintiffs contemporaneously written reports of the incident, including her supervisor's caring responses to her distress and insistence that they would move Jackson as soon as possible. They also saw the photos of plaintiff's unit, her, the control booth where she worked and the holding cell where, uh, uh, Sergeant Skerek put Jackson. And they also heard the testimony of, uh, Sergeant Skerek and Captain Patton as to why Jackson could not have, could not be immediately removed from plaintiff's unit. So plaintiff failed to prove her equal protection, uh, claim on both counts of whether he discriminated or whether he caused a third party to discriminate against her. So what was the trial evidence regarding how close the July incident was? How close Jackson was to the plane? So there are photos in the record at, uh, supplemental excerpts 181 and 181 98, which show, uh, how close the, the holding cell is to the control booth. Well, your honor it. There's one picture which shows, uh, so here, here's, so this is the control booth. This is the, if she went all the way to the front, this is the holding. So she went all the way to the front. That's how close, but the control booth goes back and the report shows that for much of the time that Jackson was in the holding cell, she was at her desk, uh, uh, not visible to him or him to her doing paperwork. And then the other. I don't know what I'm trying to get is how many feet? Um, eight feet I think was the testimony at trial. And you said there was something, uh, the door was not completely open. It's a perforated door, your honor. So you can, it's hard to, it's very thick and it's perforated. So it's not like someone's right there and you're seeing what they're doing. They're behind this perforated, very thick perforated door. And she also had the ability, the Sergeant Scarrett had assigned two, uh, correctional officers to watch him. And so officer Berndt did not have to watch him and she could retreat into the, um, control booth at her desk and do her paperwork and other things like that. She also, if you look at her report of the incident on July 12th, which is supplemental excerpts of record 170, um, she said, I stood up from her desk to check the pods for inmates and to view the yard cameras, Jackson saw that floor staff was no longer in view of him. So immediately Jackson dropped his boxers to his hips and began to masturbate. I yelled at Jackson to put that stuff away. I startled Jackson and he pulled up his boxers. So that actual incident was very brief. And if you read her other contemporaneously written report, which is that excerpts 328 to 338, you'll also, she describes the incident, much more upsetting to her was the incident of July 13, which had to do with chest pains and did not involve masturbation at all. If your honors have no further questions. Apparently not. Thank you. Thank you so much. First, I'd like to address the suggestion that there's an inconsistency between the, uh, type written, uh, report that was admitted at exhibit F at the trial for officer, uh, right by officer Berndt describing the incident. And in fact, in that report, she says, I stood in the restroom area of my control booth, staying out of eye view of Jackson for about 30 minutes. Uh, I then had other inmates calling out and having to finish up paperwork for the next shift to come on. Officer Hillman also had to finish up paperwork. This is when the incident took place. Jackson had become so vulgar with his comments and loud that I could not concentrate on my work and disrupting the unit. And she talks about how he became louder and louder and became more and more vulgar. She testified at trial to the same incident that he was masturbating. Uh, he was looking at her, um, licking his lips that he was saying, I'm going to rape you, I'm going to do things to you, you know, you like it, I'm going to get it. And those are the kinds of comments and conduct that she was being subjected to on that last day. Furthermore, in prior to that, in December of, um, the prior incident in December of 2001, she also filed a report where she talked about the fact that Jackson had masturbated toward her for at least an hour. Then he pulled his jumpsuit down and laid down on the floor of the cell, masturbating, and when she, she had to walk to the staff bathroom to not watch him and she was not able to view the inmates that were on the yard, which is a part of her control booth security duties. What we have here is conduct that is preventing Officer Burnt from engaging in her duties. Her responsibility is to watch the inmates. The suggestion that she can't see them or she's too far away from them. This is an institution that is designed so that the officers can and do and should watch what the inmates are doing. And so those are the circumstances that lead female officers to feel like, I can't do my job, I can't stay in this situation, and it alters the terms and conditions of their employment in a fundamental way. So we want to be very clear about that to minimize the conduct and the exposure and the impact that this conduct has on female officers is, in fact, contrary to what all of the cases have said. And ultimately, if this court accepts this jury verdict, it is our view that you will be turning back the clock for 30 years. In Meritor v. Vincent, Vincent versus Meritor, 1986, this court has, the United States Supreme Court has said, and it's been echoed in every decision, women should not have to walk through a gauntlet of sexual abuse just to be able to work at a particular location. The fact that this is a prison doesn't make it any different or any more acceptable. Thank you. We appreciate each side's arguments in the case of Byrne v. California Department of Corrections and Skerek is submitted and we are adjourned for this session.
judges: Ikuta, Hurwitz, Gwin